IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CRISTYNA E. MUELLER,

                              Plaintiff,

        v.                                                      OPINION and ORDER

MARTIN O'MALLEY,[1]                                             23-cv-0076-jdp
Commissioner of Social Security,

                              Defendant.

---

Plaintiff Cristyna Mueller seeks judicial review of a final decision of defendant Martin O'Malley, Commissioner of Social Security, finding that Mueller was not disabled within the meaning of the Social Security Act. Mueller contends that the commissioner's decision should be reversed and the case remanded because the administrative law judge (ALJ) erred at two key points in the disability analysis: (1) in determining that she had the residual functional capacity for a limited range of sedentary work; and (2) in determining that Mueller remained capable of performing a substantial number of jobs existing in substantial numbers in spite of her limited functional capacity. As explained in more detail below, the ALJ considered the important evidence and cited logical reasons for determining that Mueller was not disabled. Because substantial evidence in the record supports that conclusion, the court will affirm the commissioner.

---

[1] The court has updated the caption to reflect Martin O'Malley's confirmation as commissioner. *See* Fed. R. Civ. P. 25(d).

BACKGROUND

Cristyna Mueller applied for disability benefits in July 2020, alleging that she had been disabled since 2019 due to clubbed feet, hammer toes, and arthritis. R. 233.[2] After a local disability agency denied her claim initially and on reconsideration, Mueller requested an administrative hearing. An online video hearing was held on May 10, 2022, before ALJ Michael Schaefer.

In a July 2022 decision, the ALJ found that Mueller was not disabled. R. 12–27. The ALJ found that Mueller suffered from four severe impairments:  bilateral club feet with use of orthotics and braces; osteoarthritis of the bilateral feet and ankles; bilateral hammertoes; and lumbar spine dysfunction (severe lordosis). R. 15. But the ALJ determined that Mueller had the residual functional capacity (RFC) to perform work at the sedentary level of exertion (sitting up to six hours a day and standing or walking for a total of up to two hours a day, with the ability to lift ten pounds), with the following additional limitations:

- Mueller could never push or pull or operate foot controls;

- She required use of a cane at all times when ambulating on uneven terrain or for prolonged ambulation (defined as 25 feet or more);

- She could never climb ladders, ropes, or scaffolds;

- She could never kneel, crouch, or crawl;

- She could occasionally climb ramps or stairs, balance, or stoop;

- She had to avoid concentrated exposure to extremes of cold, wetness, or vibrations; and

- She had to avoid even moderate exposure to workplace hazards, including moving machinery and unprotected heights.

---

[2] Record cites are to the administrative transcript located at Dkt. 4.

R. 18. Based on testimony from a vocational expert, the ALJ concluded that Mueller could not perform her past relevant work, but that she could perform other jobs available in significant numbers in the national economy, including as a call-out operator, telephone quotations clerk, and telephone solicitor. R. 25–26. The Appeals Council denied Mueller's request for review, so the ALJ's decision became the final decision of the commissioner. R. 1.

Mueller now appeals to this court. On appeal, the court's role is to review the ALJ's decision for legal errors and to determine whether the decision is supported by substantial evidence. *See Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). The substantial evidence standard is not high and requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. But the ALJ's decision must identify the relevant evidence and build a "logical bridge" between that evidence and the final determination. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014).

## ANALYSIS

### A. RFC formulation

#### 1. Legal standards

The residual functional capacity (RFC) is "an assessment of an individual's ability to do sustained work. It is the most an individual can work despite his or her limitations or restrictions." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (citing SSR 96-8p, 61 Fed. Reg. 34474, 34475). In assessing a claimant's RFC, the ALJ must "incorporate all of the claimant's limitations supported by the medical record" and provide enough reasoning to allow the court to understand the basis for his conclusions. *See Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021); *Crump v. Saul*, 932 F. 3d 567, 570 (7th Cir. 2019).

As part of his RFC assessment, an ALJ must consider the claimant's statements about her pain and other limiting symptoms, and must "discuss[] why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p. The ALJ is not required to accept a claimant's testimony about her pain or any other complaints without question, but must minimally explain why he did not fully credit the claimant's testimony. "So long as an ALJ gives specific reasons supported by the record [the Court] will not overturn his credibility determination unless it is patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015).

Additionally, agency regulations require ALJs to explain "how persuasive [they] find all of the medical opinions" in the record. 20 C.F.R. § 404.1520c(b). ALJs must consider several factors in making this determination, the most important of which are supportability of the medical opinion and consistency of the opinion with other sources in the record. § 404.1520c(c). On review, the court may not second-guess the ALJ's evaluation of the medical opinions if the evaluation is logically explained and supported by substantial evidence. But the court must remand if the ALJ's evaluation is not supported by substantial evidence, including if the ALJ "selectively discuss[es] portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (quoting *Campbell v. Astrue*, 627 F.3d 299, 301 (7th Cir. 2010)).

### 2.  Mueller's challenges to the RFC assessment

As noted above, the ALJ found that Mueller retained the RFC to perform a limited range of sedentary work. A sedentary job is "defined as one that involves sitting, [but] a certain amount of walking and standing is often necessary in carrying out job duties." SSR 96-9p. Jobs are sedentary if walking and standing are required "occasionally," meaning "from very little up

to one-third of the time." *Id*. In general, a sedentary job requires sitting for a total of six hours of an eight-hour workday, with walking and standing generally totaling no more than about two hours a day. *Id*.

Mueller says that the ALJ's RFC is not supported by substantial evidence. First, she wages a broad attack on the ALJ's finding that she can meet the demands of sedentary work, arguing that the ALJ's RFC assessment, credibility determination, and analysis of a nurse practitioner's opinion were all "legally insufficient." Second, she contends that the ALJ erred by explicitly rejecting certain specific limitations and by ignoring evidence of others. The court begins with Mueller's general objections before addressing her more targeted challenges to the RFC assessment.

### a. Sedentary work, generally

Mueller begins by arguing that the ALJ "did not explain what evidence he relied upon to conclude Plaintiff was capable of sedentary work, including standing and/or walking 2 hours in an 8-hour workday." Dkt. 7, at 17. This is a mischaracterization of the ALJ's decision. As Mueller acknowledges, the ALJ discussed her subjective complaints, her reported activities, the objective evidence, and five medical opinions. The ALJ explained that he found persuasive the reports from Dr. Katrina Hammel and Dr. Markus Eckstein, who each performed one-time consultative examinations of Mueller at the request of the social security administration.[3] R. 19–22. The ALJ pointed out that, during both of those examinations, Mueller was found to have foot deformities, reports of pain, and an antalgic gait. But he also noted that no other

---

[3] The ALJ also evaluated the opinions from two state agency consulting physicians and from Mueller's nurse practitioner, Emily Jenders, finding them largely unpersuasive. The court addresses the ALJ's evaluation of Jenders's opinion later in this opinion.

abnormalities were observed during these or other examinations, with Mueller demonstrating full strength, full range of motion, intact sensation, the ability to get on and off the exam table without difficulty, and the ability to ambulate effectively when needed. R. 21, R. 22. He also noted that Mueller told Dr. Eckstein that sitting did not exacerbate her pain and that she could probably work if she could find a job if she could sit close to 100 percent of the time. R. 393. Mueller also told the consultants that she could complete activities of daily living and could vacuum, sweep, do laundry, wash dishes and cook, although she said prolonged standing exacerbated her pain and it took her longer than before to complete tasks. R. 21–22; R. 382; R. 393. Both Eckstein and Hammel found that Mueller could sit continuously, but could stand or walk only occasionally. R. 386, 398.

Mueller does not challenge the ALJ's evaluation of Eckstein and Hammel's opinions. As the ALJ reasonably concluded, their opinion that Mueller had no limitations on sitting and could stand or walk occasionally was generally consistent with an ability to perform sedentary work. So contrary to Mueller's argument, the ALJ's RFC assessment does not suffer from a "gaping hole" in the record. Because the path of the ALJ's reasoning is clear, the court rejects Mueller's first argument.

Mueller next challenges the ALJ's evaluation of her subjective complaints. As Mueller admits, the ALJ acknowledged Mueller's statements concerning her worsening pain and standing tolerance, difficulty balancing, frequent falls, and reported use of a cane. R. 18–19. The ALJ largely credited Mueller's statements, finding that because of her musculoskeletal deformities, pain, and abnormal gait, she was capable of only a reduced range of sedentary work. But he rejected Mueller's allegation that her symptoms prevented her from performing

any gainful employment, finding it to be inconsistent with the objective medical evidence and other evidence in the record. R. 19.

Similar to her broad challenge to the RFC formulation, Mueller says the ALJ "did not point to any inconsistencies between Mueller's statements and any of the evidence in the record," but merely summarized the evidence. Dkt. 7, at 11. Again, the court disagrees. The ALJ contrasted Mueller's allegations of a disabling condition with: her ability to perform daily activities, including vacuuming, sweeping, doing laundry, washing dishes, and cooking (albeit with difficulty); her largely normal physical examinations (apart from her congenital foot abnormalities); and the opinions of the consulting medical examiners, Hammel and Eckstein, who both found that Mueller had no limitations on sitting and could stand and walk occasionally. Although some parts of the ALJ's decision provide summaries of the record, the basis for his credibility determination is fairly articulated in his discussion of the medical opinions. In reviewing the ALJ's decision, the court reads the decision as a whole; the court will not discount the ALJ's reasoning simply because it appears elsewhere in his decision. *Marshall v. O'Malley*, No. 22-cv-662-jdp, 2024 WL 1327360, at *3-4 (W.D. Wis. Mar. 28, 2024).

Mueller criticizes the ALJ for failing to consider that her daily activities were restricted and that she attempted to continue to work at her past job as a home attendant in spite of her physical challenges, before eventually quitting. Dkt. 7, at 14–16. But the ALJ *did* acknowledge that it was difficult for Mueller to carry out her daily chores because of her foot problems and related pain and balance issues. Still, Mueller was able to do them, and the ALJ was entitled to consider this fact, along with the objective medical evidence and the medical opinions, in arriving at the conclusion that Mueller could perform the occasional walking and standing required of sedentary work. As for Mueller's work history, work history is just one factor among

many that an ALJ may consider, and "it is not dispositive." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). Moreover, Mueller's past work was performed at the light level of exertion, which is more demanding than the reduced range of sedentary work that the ALJ assigned. So Mueller's work ethic is commendable, but her past history is not incompatible with the ALJ's conclusion that she retained the ability to perform a limited range of sedentary work in spite of her alleged limitations.

In her third, broad-based challenge, Mueller argues that the ALJ erred in his evaluation of a medical capacity questionnaire completed by Jenders in April 2021. Some of Jenders's responses suggested that Mueller had the ability to perform sedentary work, *see* R. 417 (indicating that Mueller was unable to do a "physical job" because of foot and toe problems) and R. 417 (stating that Mueller could not do a "good deal of walking or standing"), but others indicated that Mueller was precluded from competitive work at any exertion level. Specifically, Jenders opined that Mueller would be absent for two days a month for medical appointments and therapy and that she could not sustain a job on a long-term basis if it required "a combination of sitting, standing, and walking for 8 hours continuously, 5 days per week[.]" R. 16-19. Several other questions were left blank.

The ALJ did not error in his assessment of Jenders's April 2021 opinions. The ALJ explained that he found them unpersuasive because they were neither well-supported nor consistent with the medical evidence overall. R. 23. Specifically, the ALJ contrasted Jenders's opinions with Mueller's general ability to perform her daily activities and with physical examinations, which did not support an inability to perform sedentary work. The ALJ also noted that Jenders's vague statements to the effect that Mueller was unable to do a "good deal of walking or standing" or perform a "physical job" were not inconsistent with sedentary work.

In addition, the ALJ noted that the medical evidence did not suggest the degree of ongoing, consistent treatment or therapy that would require two absences a month. R. 23. Thus, the ALJ properly complied with the regulations by addressing the issues of supportability and consistency and explaining the basis for his conclusions. The ALJ's reasons were logical and supported by the record, precluding second-guessing by this court.

In sum, reading the ALJ's decision as a whole, the court is satisfied that the ALJ properly considered the relevant factors and adequately explained his reasons for his RFC assessment, including why he rejected Mueller's allegations of disabling limitations and Jenders's favorable opinions. The court further concludes that the reasons and evidence provided by the ALJ, while perhaps not overwhelming, reasonably support the ALJ's conclusion that Mueller can perform sedentary work. So Mueller is not entitled to a remand on any of these grounds.

The court now turns to Mueller's challenge to specific features of the ALJ's RFC determination. Mueller says the following findings by the ALJ are not supported by substantial evidence:  Mueller needs a cane only for uneven surfaces or certain distances, not all the time; Mueller does not need to elevate her legs periodically while sitting; and Mueller could attend work reliably. Mueller also says the ALJ erred by failing to discuss how her obesity and mild mental impairments affected her ability to work when combined with her other impairments.

### b.  Use of a cane

At the hearing, the vocational expert testified that if the RFC included a requirement for use of a cane at all times, including standing, then there would be no competitive work at the sedentary level. R. 65. In his decision, the ALJ expressly considered whether a cane limitation was necessary. R. 24. The ALJ found that use of a cane did not appear to be "medically necessary," insofar as no doctor had prescribed or even recommended it, and

9

physical examinations indicated that Mueller could ambulate effectively, albeit slowly, without one. *Id*. Nevertheless, giving some credence to Mueller's testimony and reports of falls, as well as to objective evidence that she had weak ankles, a cautious gait, and tended to use a wall or object for support while standing, the ALJ found that a cane "might be necessary for stability on a sustained basis," so he added a restriction that Mueller needed a cane for walking more than 25 feet or on uneven terrain. *Id*.

Mueller does not argue that the ALJ misstated or overlooked any evidence. Instead, she argues that this court must reverse the ALJ's cane restriction because it "is not supported by any of Plaintiff's statements or any of the opinions offered." Dkt. 7, at 18. But "[a]n ALJ does not err in assigning a residual functional capacity if 'there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.'" *Moyer v. O'Malley*, No. 23-2599, 2024 WL 1411565, at *3 (7th Cir. Apr. 2, 2024) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)). What is more, for the ALJ to find that use of a cane is medically necessary, there must be "medical documentation establishing the need for [the cane] to aid in walking or standing, and describing the circumstances for which it is needed." *Golombiski v. Kijakazi*, No. 22-cv-440-jdp, 2023 WL 6314643, at *3 (W.D. Wis. Sept. 28, 2023) (citing SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996)). "The mere fact that the claimant has been seen or reported to be using an assistive device is not sufficient." *Id.* (quoting *Limberg v. Kijakazi*, No. 21-cv-189-bbc, 2022 WL 406057, at *6 (W.D. Wis. Feb. 10, 2022)). Rather, there must be an "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary." *Id.*

As Mueller acknowledges, there was no medical opinion stating that she needed a cane at all, much less one unambiguously stating the circumstances in which it was needed. Even so,

10

the ALJ went further and gave partial credit to Mueller's subjective complaints, finding that use of a cane was warranted for longer distances or uneven surfaces. The ALJ did not need to tie this finding to a specific piece of evidence: Mueller, not the ALJ, had the burden of producing medical evidence in support of her claimed limitations. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Mueller has not met this burden with respect to her asserted full-time need for a cane.

### c. Leg elevation

Next, Mueller says the ALJ erred by failing to adopt a limitation that Mueller needed to elevate her legs to waist height periodically throughout the day. As evidence supporting such a restriction, Mueller points to her hearing testimony that, starting around 2020, she typically elevated her feet to waist height during the day for about 10–15 minutes every 60–90 minutes, to relieve both pain and swelling. R. 55–56. She also points to a May 2022 letter from her nurse practitioner, Emily Jenders, asking that Mueller be allowed to elevate her feet above her waist 4 to 5 times a day. The vocational expert testified that, depending on the particular work environment, there might be jobs available to a person who had to elevate her legs to waist height for 10 to 15 minutes twice a day outside of normal work breaks. R. 66–67. But he said he did not have any data to support how many such jobs existed. R. 67.

In his decision, the ALJ expressly rejected a leg-elevation restriction. R. 23. He noted that the suggestion that it was needed for pain relief was inconsistent with Mueller's statements during the consultative exams, when she said sitting did not increase her pain. As for Jenders's May 2022 letter, the ALJ found it unpersuasive for three additional reasons: (1) it was not a full functional statement but only a "request" that Mueller be allowed to elevate her legs; (2) it was inconsistent with an April 14, 2021, opinion from Jenders stating that Mueller did *not*

11

need to elevate her legs during the day; and (3) medical exams detected no edema or swelling or a change in Mueller's condition that would support a need for leg elevation to reduce swelling. R. 23.

Mueller argues once again that the ALJ did not properly evaluate Jenders's opinion as required by the commissioner's regulations, but her arguments have no merit. As an initial matter, it is debatable whether Jenders's one-sentence "request" that Mueller be allowed to elevate her legs even qualifies as an "opinion." 20 C.F.R. § 404.1513(a)(2)(defining "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform physical and mental demands of work). Even so, the ALJ complied with his regulatory obligations and evaluated its persuasiveness, focusing on whether it was well-supported and consistent with other evidence in the record. 20 C.F.R. §§ 404.1520c(b) and (c). As noted, the ALJ found neither to be the case. The ALJ explained that Jenders's request was not a "full functional statement" and was inconsistent with other evidence in the record, including Jenders's own previous statement and examinations finding no swelling, and with Mueller's statements to the consultative examiners in which she denied that sitting caused pain. These reasons were both well-explained and supported by substantial evidence, so the court must defer to the ALJ.

Mueller concedes that clinical examinations did not detect any swelling or edema in her legs. But she argues that her practice of elevating her legs at home could explain why her legs weren't swollen during examinations and, in turn, support a need for her to elevate her legs to waist height periodically during the day. Dkt. 7, at 23. But this is pure speculation. In April 2021, long after Mueller says she started elevating her legs, Jenders offered her opinion that

Mueller did *not* need to elevate her legs. And as the ALJ pointed out, there is nothing in the medical evidence to explain what changed between then and May 2022, when Jenders wrote her one-sentence letter "requesting" that Mueller be allowed to elevate her legs at work.

In short, Mueller has failed to demonstrate that the ALJ erred in rejecting Jenders's opinion. Because Mueller identifies no other evidence that compels the addition of a leg-elevation restriction, the ALJ did not err in declining to include one. *See Gedatus v. Saul*, 994 F.3d 893, 900-01 (7th Cir. 2021) ("We will reverse only if the record compels a contrary result.") (internal quote marks omitted); *Delong v. Saul*, 844 Fed. Appx. 894, 900 (7th Cir. 2021) ("[E]ven if the record could support [additional] limitations, there is nothing that compels them.").

### d.  Work attendance

At the hearing, Mueller testified that she had about three days a week when she was more mobile, and could drive the 15 minutes to the nearby city, but at least one "bad day" each week when she was "unable to get around at all." R. 46. Mueller says the ALJ erred by "failing to evaluate" this testimony and consider whether she would miss work and how frequently. But an ALJ "is not required to address every piece of evidence or testimony presented[.]" *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), Furthermore, the ALJ need only include limitations that are supported by the medical record. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022). Mueller does not cite any objective medical evidence indicating that her symptoms wax and wane or that supports the suggestion that she would be absent one to two times a month because of her medical condition. Accordingly, the ALJ was under no duty to include Mueller's self-reported "bad days" into the RFC. *Knox v. Astrue*, 327 F.App'x 652,

655 (7th Cir. 2009) ("There is no presumption of truthfulness for a claimant's subjective complaints.").

Jenders did state on an April 2021 questionnaire that Mueller would be absent two days a month for medical appointments and therapy. R. 419. But as noted previously, the ALJ rejected this opinion, noting that the record did not reveal that Mueller was receiving ongoing, consistent treatment or therapy that would warrant such absences. R. 23. Mueller doesn't specifically take issue with this finding or point to any records suggesting that she received frequent treatment or any ongoing therapy for her condition. So the court concludes that the ALJ reasonably declined to find that Mueller would have an unacceptable level of absenteeism as a result of her medical condition.

### e.  Obesity

Mueller says that the ALJ erred by failing to consider her obesity. *See* SSR 02-1p, 2002 WL 34686281, at *7 (Sept. 12, 2002) (when obesity is identified as a medically determinable impairment, agency will consider functional limitations resulting from obesity in RFC assessment); *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012). Mueller doesn't identify any medical records diagnosing her with obesity or identifying it as a medical concern, and she didn't specifically claim obesity as an impairment either in her application or at the hearing, so it's not surprising that the ALJ didn't discuss it. But as Mueller points out, she has a Body Mass Index of around 32, *see* R. 43 and R. 432, which constitutes Level I obesity under the National Institutes of Health guidelines. SSR 02-1p, 2002 WL 34686281, at *2 (Level I obesity includes BMIs between 30.0 and 34.9). So the ALJ probably should have addressed it. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (references to weight in claimant's medical records likely sufficient to alert the ALJ to the impairment).

14

Even so, remand is not required for further evaluation of obesity when the plaintiff "does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk[.]" *Id.*; *Brumbaugh v. Saul,* 850 F. App'x 973, 976 (7th Cir. 2021) (finding same). Such is the case here. Mueller identifies no records that refer to any limitations caused by her obesity, nor does she explain how her obesity affects her ability to work. Instead, she merely speculates that her obesity "could have" a significant effect on her other impairments. *See, e.g.,* Dkt. 7, at 35 (noting that weight gain "can" contribute to swelling of the ankles). Additionally, the ALJ relied largely on the opinions of Drs. Hammel and Eckstein, both of whom presumably were aware of Mueller's BMI and both of whom concluded that Mueller could tolerate the sitting and occasional walking or standing required of sedentary work. So Mueller's obesity was "factored indirectly into the ALJ's decision as part of the doctors' opinions." *Skarbek*, 390 F.3d at 504.

### f.  Mental impairments

Mueller argues that the ALJ erred by failing to account for her non-severe impairments of anxiety and depression.[4] Dkt. 7, at 22. This argument fails for the same reasons as her obesity argument. Mueller merely speculates about the effect that her mental impairments could have on her pain, without identifying specific evidence in the record substantiating such an effect, much less presenting evidence that would support additional restrictions in the RFC assessment. Indeed, Mueller doesn't even propose additional limitations: she merely says the

---

[4] The ALJ determined that Mueller's anxiety and depression were non-severe, controlled with medication, and did not affect Mueller's mental functioning apart from mildly limiting her ability to adapt or manage herself. R. 15–16. The ALJ further noted that Mueller did not allege that she was significantly limited by mental issues. R. 16. Mueller does not challenge these conclusions.

ALJ should have "analyzed" the impact of her mental impairments combined with her other impairments. Dkt. 7, at 21. But again, it is up to Mueller to supply adequate records and evidence to show that her mental impairments actually had an impact on her ability to work. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Mere speculation, with no support in the record, is insufficient to show that the ALJ committed reversible error. *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999).

**B.  Step five determination**

At the hearing, a vocational expert (VE) offered three examples of jobs that could be performed by a person with the limitations that the ALJ ultimately adopted as Mueller's RFC: call-out operator (3,000 jobs nationally); telephone quotations clerk (4,000 jobs nationally); and telephone solicitor (75,900 jobs nationally). The ALJ credited this testimony and relied on it for his conclusion that, although Mueller could no longer perform her past work as a home attendant, she could make a vocational adjustment to other jobs existing in substantial numbers in the national economy. R. 26. Mueller says reversal is required because the first two jobs are obsolete and the VE's testimony with respect to the third job, telephone solicitor, was unreliable.

The court begins with the telephone solicitor job. The VE testified that the *Dictionary of Occupational Titles* (DOT) rated the telephone solicitor job as an "SVP 3 job." But he said that in his experience and according to the *Occupational Requirement Survey* (ORS), the job generally could be learned in 30 days, meaning that it was actually an "SVP 2 job." R. 63–64; *see* SSR 00-4P, 2000 WL 1898704, *3 (noting that the "DOT lists a specific vocational preparation (SVP) time for each described occupation" and that "unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4[.]"). The VE said that the

16

job number he provided (75,900) was derived from a software program (Job Browser Pro) and represented the total percentage of telephone solicitor jobs that were consistent with an SVP 2 rating.[5] R. 64.

In his decision, the ALJ accepted the VE's conclusions about both the skill level required of telephone solicitors and the number of those jobs that were rated SVP 2.[6] R. 26. Mueller says this was reversible error because the ALJ failed to comply with his affirmative obligation under SSR 00-4p to "resolve the conflict" between the VE's testimony and the DOT concerning the skill requirements of the telephone solicitor jobs. *See* SSR 00-4p, 2000 WL 1898704, *4 (ALJ has affirmative obligation to ask about any possible conflict between vocational expert's testimony and the DOT concerning job requirements, and if a conflict exists, to explain in the decision how he or she resolved the conflict). Dkt. 7, at 27. This argument is not persuasive. The ALJ specifically found that the VE had experience to identify occupations/jobs available, and that the expert had relied on his "training, experience, and familiarity with the labor market generally, and the above jobs specifically as the basis of his opinion that those occupations are viable within the RFC[.]" R. 26. With respect to the skill level, the ALJ noted the conflict with the DOT, but explained that the VE "relied on the BLS Occupational Requirement Survey (ORS) for the reality that a percentage of those jobs can be and are learned within 30 days and

---

[5] Mueller points out that certain portions of the VE's testimony are described as "inaudible" in the transcript. According to Mueller, this makes it unclear whether the number 75,900 represented the total number of telephone solicitor jobs or only those that were rated SVP 2. R. 64. The court disagrees. Regardless of the inaudible portions, the transcript makes clear that 75,900 represented the "eroded" job numbers, as the ALJ found in his decision. R. 64 (Q: [T]he total number you are giving is the number that the ORS identified as per the percentage . . . as being available at SVP 2?" A: "Yes, sir, that's correct.").

[6] The parties seem to agree that Mueller's RFC precluded her from performing SVP 3 jobs.

consistent with an SVP of two." *Id*. Giving the ALJ's decision a common-sense reading, it's clear that the ALJ concluded that the VE's experience and current knowledge of the labor market, along with the Occupational Requirement Survey, better reflected "reality" than the DOT. This was a reasonable conclusion, so this court cannot reverse it. *See Yanke v. Kijakazi*, No. 20-cv-1055, 2021 WL 4441188, at \*3 (E.D. Wis. Sept. 28, 2021) ("[I]t is readily accepted that the DOT, last updated in 1991 and generally containing information describing jobs as they existed in 1977, is outdated, if not downright obsolete.").

Mueller also says reversal is required because it is not clear from the VE's testimony how he arrived at the conclusion that there were 75,900 telephone solicitor jobs. When asked by the ALJ how he came up with his estimate, the expert responded:

> I utilize the Job Browser Pro, SkillTRAN numbers. It's, again, not a perfect art – or a perfect science, but it's really kind of the best scientific art [phonetic] we've got right now. Certainly, we have advanced over the OEQ, which was previously the most utilizing [sic] source.

R. 64–65. Neither the ALJ nor Mueller's attorney asked the expert any follow-up questions on this point.

As the commissioner argues, Mueller's failure to object to the VE's job numbers testimony is fatal to her challenge on appeal. To preserve objections to the VE's testimony for appeal, the claimant must object at the hearing or in a post-hearing brief. *Fetting v. Kijakazi,* 62 F.4th 332, 338 (7th Cir. 2023) ("[T]o avoid forfeiture, a claimant must do more than make a general objection or vaguely ask the VE about his methodology" but must "raise specific concerns" about the VE's testimony or the methodology used). Here, Mueller did not object to the VE's testimony or even ask him a single question about the basis for his job number estimates. This omission distinguishes this case from *Staples v. Kijakazi*, No. 21-cv-379-jdp,

2023 WL 2753855, at *2 (W.D. Wis. Apr. 3, 2023), a case Mueller relies on heavily in her brief. *See id*. (noting that counsel cross-examined the VE at length and submitted a detailed post-hearing brief challenging the reliability of the VE's job estimates). Simply put, "a claimant may not start objecting to unquestioned and uncontradicted VE testimony in federal court after the closure of the administrative record." *Leisgang v. Kijakazi*, 72 F.4th 216, 220 (7th Cir. 2023). So Mueller has forfeited this argument.

    In sum, Mueller has failed to show that substantial evidence does not support the ALJ's conclusion that she is capable of performing 75,900 telephone solicitor jobs. Mueller does not dispute that 75,900 is a "significant number," *see, e.g., Wegerer v. Kijakazi*, No. 22-cv-123-jdp, 2023 WL 6307407, at *7 (W.D. Wis. Sept. 28, 2023) (affirming conclusion that 23,600 was significant and citing cases affirming lower numbers), so it is unnecessary to consider her argument that the other two jobs are obsolete. The court affirms the ALJ's step five determination.

## C. Conclusion

    Mueller has failed to show that the ALJ committed any harmful legal errors or that his decision that Mueller is not disabled is not supported by substantial evidence. Mueller faces considerable physical challenges, but she has failed to show that she is disabled under the Social Security Act.

ORDER

IT IS ORDERED that the decision denying disability benefits to plaintiff Cristyna E. Mueller is AFFIRMED. The clerk of court is directed to enter judgment in favor of the commissioner and close this case.

Entered September 23, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge